# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

|  |  |
|---|---|
| Douglas A. Kelley, in his capacity as the court-appointed Receiver of Thomas Joseph Petters; Petters Company Inc., aka PCI; Petters Group Worldwide, LLC; Deanna Coleman aka Deanna Munson; Robert White; James Wehmhoff; Larry Reynolds, and/or dba Nationwide International Resources aka NIR; Michael Catain, and/or dba Enchanted Family Buying Company, | Court File No. _____ |
|  | **JURY TRIAL DEMANDED** |
| Plaintiff, |  |
| vs. | **COMPLAINT** |
| Thomas Beaudoin, |  |
| Defendant. |  |

---

Douglas A. Kelley, (the "Plaintiff" or "Receiver"), in his capacity as the court-appointed Receiver of the above captioned individuals and entities, by and through his legal counsel, Kelley, Wolter & Scott, P.A., brings this Complaint against Defendant Thomas Beaudoin ("Defendant" or " Beaudoin"), to recover a $500,000.00 cash transfer from Thomas J. Petters ("Petters") to Defendant. The cash was transferred to Defendant in furtherance of a multi-billion dollar Ponzi scheme. Plaintiff, based on actual knowledge and upon information and belief, states and alleges as follows:

## INTRODUCTION

1.      From the early 1990's, Petters ran what became a $3.8 billion Ponzi scheme before one of his lieutenants revealed the fraud to federal law enforcement. Relying upon

stolen money and a pyramid of lies, he appeared to amass a vast financial empire.  Petters' businesses survived, not because of their financial success, but rather because they were supported with massive amounts of stolen money.  In order to keep the Ponzi scheme going, Petters needed an ever increasing supply of new investor money to pay interest to previous investors, run his front of businesses, and to replace the money he was siphoning off for himself, his close friends and business partners.

2.      To pull off this massive fraud, Petters created a public aura of financial success to ensure a ready supply of new investors and to allay any suspicions of established investors.  He gave lavishly from this pool of stolen money to universities and other charitable causes, and paid exorbitant sums of money to surround himself with executives, partners and friends who helped create the essential air of success and wealth required to sustain the fraud.

3.      Beaudoin was one of these people.  Defendant was hired as an employee of Polaroid Corporation ("Polaroid") in the position of Vice-President and Controller in February 2004 and was later promoted to Chief Financial Officer.  In early 2005, Petters and PGW purchased Polaroid.  On August 1, 2005, Petters promoted Beaudoin to Chief Financial Officer and Chief Operations Officer for Polaroid.  As such, Beaudoin was one of the key individuals appointed by Petters and PGW to their executive team to "manage Polaroid and take business into the future."   Beaudoin, as a chief executive of Polaroid, managed finance, treasury, tax, manufacturing operations, legal functions and information technology across Polaroid.  Beaudoin continued in that position until he left Polaroid in June 2008.

4.      Petters considered Beaudoin part of his close network of executives, advisors and consultants and, consequently, Beaudoin possessed considerable control over Petters. He leveraged his position with Petters to receive money and other gifts.  In January 2007, Beaudoin received $500,000.00 directly and secretly from Petters.  These funds came from the proceeds of the ongoing Ponzi scheme.   The success of Beaudoin and Polaroid helped Petters to establish himself as a skilled businessman.  In essence, Beaudoin gave Petters business credibility and access to new potential victims for his fraudulent schemes.

5.       Beaudoin knew of the fraud or willingly ignored it and accepted substantial payments and gifts from the scheme, including a cash payment of $500,000.00 directly from Petters' personal account.  In total, the Receiver seeks disgorgement of $500,000.00 in fraudulent transfers from the Receivership Estate to Beaudoin.

<u>NATURE OF THE PROCEEDING</u>

6.      On October 3, 2008, pursuant to 18 U.S.C. § 1345, the United States District Court of the District of Minnesota placed Petters, PCI, Petters Group Worldwide ("PGW"), and various affiliated entities, among others, in receivership in civil litigation commenced by the United States of America (Court File No. 08-CV-5348) (the "Receivership").

7.      By Order of the United States District Court of the District of Minnesota in the Receivership Action dated October 6, 2008, as subsequently amended and restated on December 8, 2008, the United States District Court of the District of Minnesota duly appointed Douglas A. Kelley, Esq. as the equity receiver of multiple entities owned and/or controlled by Petters, including PCI, PGW, and numerous other Petters-related entities (collectively, the "Receivership Estate").

3

8.     As the court-appointed Receiver, Kelley serves as an agent of the United States District Court for the District of Minnesota and in that capacity possesses exclusive custody, control and possession of the property, assets and estates of the Receivership Estate.

9.     The Receiver brings this action against Defendant to recover a fraudulent transfer of property by the Receivership Estate to Defendant.

10.    The Receiver seeks to recover such transfer and preserve the property of the Receivership Estate for the benefit of individuals and organizations defrauded by the massive Ponzi scheme.

## THE PARTIES

11.    Plaintiff Douglas A. Kelley, was appointed Receiver of the Receivership Estate on October 6, 2008, as amended in that certain Second Amended Order for Entry of Preliminary Injunction, Appointment of Receiver, and Other Equitable Relief (the "Receivership Order"), dated December 8, 2008, (Court File No. 08-CV-5348) [Docket No. 127]. Pursuant to the Receivership Order, the Court vests the Receiver with the full power of an equity Receiver and requires the Receiver to "[t]ake exclusive immediate custody, control, and possession of all property, assets, and estates belonging to or in the possession, custody, or under the control of Defendants, wherever situated." Receivership Order at 13. "The Receiver shall have full power to … sue for, collect, receive, take in possession …all assets of Defendants." *Id*.

12.    Defendant is a resident of Massachusetts, residing at 19 Northbriar Road, Acton, MA 01720.

4

## JURISDICTION, VENUE AND STANDING

13.     The Receiver has the capacity to commence this action pursuant to 28 U.S.C. § 754, 28 U.S.C. § 1692 and the Receivership Order.

14.     The Court has ancillary jurisdiction over this action as it is instituted by a federal equity receiver to execute his duties as set forth in the Receivership Order and pursuant to 18 U.S.C. § 1345.  This action seeks to accomplish the ends sought by the civil case, pursuant to 18 U.S.C. § 1345, in which Kelley was appointed as Receiver, *United States v. Petters, et al.*, 08-cv-5348 (D. Minn.).

15.     Jurisdiction of this action is also based upon 28 U.S.C. § 1332 in that there is complete diversity between the Plaintiff and Defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

16.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and transfers giving rise to Plaintiff's claims occurred in Minnesota.

17.     Venue for this action is also proper in this district because i) this action is ancillary to the United States' proceedings pending in this district; ii) the Receiver was appointed in this district; and iii) the Receivership Individuals made all of the transfers at issue in this action from this District.

## STATEMENT OF FACTS

### THE PONZI SCHEME

18.     This proceeding arises from a massive fraud and Ponzi scheme designed and orchestrated principally by Petters, the other Receivership Individuals and business organizations that they operated (the "Ponzi Scheme").

19.     Petters operated the Ponzi Scheme with the assistance of other individuals within certain Petters organizations from approximately 1993 through the date of his arrest by federal agents on October 3, 2008.

20.     Commencing in or about 2001 and continuing to in or about September 2008, Petters, through various entities that he controlled, including PCI and PGW, and with the assistance of others, laundered what is estimated to be an amount in excess of $40 billion.

21.     On December 1, 2008, Petters was indicted by a Federal Grand Jury in the District of Minnesota that charged him with 20 separate counts of mail and wire fraud, money laundering and conspiracy to commit mail and wire fraud and money laundering in connection with the perpetration of the Ponzi Scheme.

22.     On December 2, 2009, a jury in the United States District Court of the District of Minnesota found Petters guilty of all 20 counts charged in the Indictment.

23.     At various times during the course of the Ponzi Scheme, Petters was assisted in the operation of the scheme by numerous individuals, including, but not limited to, Coleman, Reynolds and White (collectively, the "Receivership Individuals" or "Associates").

24.     In 2008, Coleman, Reynolds and White each pleaded guilty to various crimes directly arising from, and connected to, the perpetration of the Ponzi Scheme and their affiliation with Petters and entities that he owned and operated to further the Ponzi Scheme.

25.     The scheme orchestrated by the Receivership Individuals, through a multitude of entities owned and operated by Petters, was a common species of fraud with the nefarious trademark of a Ponzi Scheme.  Petters, through a number of his entities and in concert with other Receivership Individuals, would repay initial investors not with the fruits of their investment, but with false profits harvested from funds obtained from other investors.

26.     Petters and the other Receivership Individuals, through PCI, PGW and a multitude of shell companies intended that the payments to early investors would induce ongoing, repeated and more widespread investment in the Ponzi Scheme and thereby further perpetrate and extend the life of the fraud.

27.     To obtain investors in the Ponzi Scheme, Petters, the other Receivership Individuals, PCI and its agents and PGW and its agents, made numerous false statements, false representations and material omissions to fraudulently induce investors to provide PCI and PGW with billions of dollars.

28.     Petters portrayed to investors that the funds were to be used to purchase merchandise which would then be sold to retailers at a profit.  Instead, Petters, the other Receivership Individuals, PCI, PGW and others would divert the funds to other purposes.

29.     Funds received by PCI, PGW, Petters and the other Receivership Individuals from lenders were not used to purchase electronic goods as represented, but instead were used to repay other investors their principal and interest, to purchase and/or support other

7

business operations owned or controlled by Petters, to finance Petters' extravagant lifestyle and were otherwise paid, as income, to the other Receivership Individuals.

30.     As part of the Ponzi scheme and in furtherance of it, on multiple occasions Petters or his Associates caused the proceeds of the Ponzi scheme to be transferred to Petters' controlled businesses, including but not limited to PCI, PGW and their subsidiaries or affiliates, to enable those businesses to make payroll and to pay employee bonuses, consulting fees and commissions and to make loans, gifts or other incentives to employees, directors, officers, consultants, relatives and friends.   Petters or his Associates also transferred Ponzi scheme money to Petters personal accounts to finance a lavish lifestyle and to make payments directly to individuals, including sums to Defendant.  These transfers were made with the intent to defraud and to further the Ponzi scheme.

31.     The aggregate amount of funds transferred by Petters, PCI and Polaroid to Defendant is at least $3,478,070.00.   The Receiver in this action seeks to recover the transfers to Defendant from Petters personal account and from the Receivership Estate in the amount of $500,000.00 (the "Fraudulent Transfer").

32.     Because Petters and PCI were perpetrating a Ponzi Scheme, and all of their income was derived from proceeds of the fraudulent Ponzi Scheme, the Fraudulent Transfer to Defendant was made with the actual intent to hinder, delay or defraud Petters' creditors.

33.     Petters Fraudulent Transfer to Defendant were intended, among other things, to create the appearance of success and a continuing profitable enterprise on behalf of PCI, PGW or the other multitude of entities created by Petters and the other Receivership Individuals.

34.     Petters, or Petters and the Receivership Individuals, fraudulently and intentionally concealed the ongoing fraud in an effort to hinder and delay authorities and most current and prospective investors and most other creditors of PCI, PGW, and other entities from discovering the fraud.

35.     The concealment of the fraud, whether by Petters' silence, by the fraudulent intentional concealment of the facts constituting the fraud, or by the adverse domination of PCI, PGW, and other entities by Petters and his Associates, prevented authorities and most creditors and investors from discovering the ongoing fraud until the Receiver was appointed and placed in control of the entities and was able to discover facts constituting the fraud alleged in this Complaint.

36.     The Receiver has acted diligently to discover facts constituting the fraud alleged in this Complaint.

37.     Any temporal limitations, statutory or otherwise, on the Receiver's ability to bring the causes of action set forth below are tolled by, among other things, Petters' breach of fiduciary duty in failing to disclose the fraud, the actions of Petters, or Petters and the Receivership Individuals, in fraudulently and intentionally concealing the fraud, or the adverse domination of PCI, PGW, and other entities by Petters, or Petters and the Receivership Individuals, until the appointment of the Receiver.

## THE FRAUDULENT TRANSFER

38.     As part of the Ponzi scheme and in furtherance of it, on multiple occasions Petters, or Petters and his associates, caused monies from PCI – the proceeds of the Ponzi scheme – to be transferred to Petters or Petters' controlled businesses, including but not

limited to PGW and its subsidiaries or affiliates, to enable those businesses to make payroll and to pay bonuses, severance payments, commissions or other incentives to employees, directors and officers and consultants, or to Petters so that he could directly pay such sums to employees, directors, and officers and consultants for such purposes.  These transfers were made with the intent to defraud and to further the Ponzi scheme.

39.    To the extent that an employment contract, bonus plan or agreement, incentive plan or agreement, or other compensation plan or agreement existed between the Defendant and the Receivership Estates, which the Defendant claims created an obligation incurred by the Receivership Estates (the "Obligations"), Defendant gave nothing of value or provided value that was less than reasonably equivalent in exchange for the Obligations.

40.    During the course of the Ponzi scheme, on or about January 16, 2007, Defendant cashed a personal check from Petters dated January 2, 2007, in the amount of $500,000.00 and made payable to "Tom Beaudoin".  The check was drawn on Petters' personal account at Crown Bank and bore a handwritten notation stating, "Thank you!"  True and correct copies of the check and corresponding bank statement from Petters' personal account are attached hereto as Exhibit 1.

41.    Petters was insolvent on the date of any Obligations and on the date the Fraudulent Transfer was made, or alternatively, the Fraudulent Transfer left Petters and the Receivership Estates with an unreasonably small amount of capital with which to operate. At the time of the Fraudulent Transfer, Petters, PCI, PGW and Petters' other affiliates owed

hundreds of millions of dollars to as much as $3.8 billion to creditors and possessed fraudulently pledged and vastly insufficient assets to repay their debts.

42.     At all relevant times, Polaroid was a Petters affiliate company, and was 100% owned by the Petters entity PGW.  Defendant was Polaroid's Chief Financial Officer and Chief Operations Officer.  In this role, Defendant served as a close and trusted advisor of Petters.  Consequently, Defendant had special knowledge or access to information regarding the Ponzi scheme, was a control person of PGW and its affiliates, and an insider within the meaning of Minn. Stat § 513.41(7).

43.     By virtue of Defendant's close relationship with Petters and his participation in the Ponzi scheme, Defendant was able to exert influence over the Receivership Estates and attain the Fraudulent Transfer.

44.     The Fraudulent Transfer is disproportionately large relative to Defendant's salary, work duties and performance and was not a result of arm's length transaction, or made in furtherance of a legitimate business purpose, but rather were gratuitous, was made in furtherance of the fraud, and paid to Defendant to reward his loyalty to the Ponzi scheme.

45.     Notably, the cash payment to Defendant was not made by Polaroid, the company that purportedly employed him, but rather was made directly by Petters, using his own personal checking.

46.     In 2005 when Beaudoin was promoted by Petters and PGW to become Polaroid's Chief Financial Officer and Chief Operations Officer, he executed an offer letter and enhanced severance agreement whereby he was to receive a base salary of $375,000, was eligible for a 75% bonus plan, received a signing bonus of $35,000 and became eligible

for a severance package of eighteen months of pay, plus benefits and a retaining bonus. Copies of the offer and agreement are attached hereto as Exhibit 2.  Beaudoin was paid in excess of $2 million by Polaroid under the agreement. Defendant received an additional $500,000.00 from Petters over and above the salary, bonuses, severance and benefits he received from Polaroid during his four years of employment.

47.    The Fraudulent Transfer to Defendant exceeded the market value of equivalent types of payments for equivalent performance during the relevant time period.

48.    Defendant knew, or should have known, that the Fraudulent Transfer from Petters he received was not made in the ordinary course of business or through an arms-length transaction.

49.    Defendant received and accepted the Fraudulent Transfer despite the unreasonable amounts of the payment and failed to exercise reasonable due diligence with respect to the source and amount of the payment.

50.    Defendant knew or should have known that he was benefiting from fraudulent activity, or at a minimum, failed to exercise reasonable due diligence with respect to Petters, PCI and PGW in connection with the Ponzi scheme.  Defendant ignored numerous indicia of fraud from the general manner in which Petters, PCI and PGW operated.

51.    Any Obligations and the Fraudulent Transfer to Defendant, and to employees, directors, officers and consultants, were made as part of the Ponzi scheme to impress existing and future investors, add credibility to the massive Ponzi scheme, and convey that Petters, PCI and PGW were trustworthy, impressive and profitable.

52.     To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

53.     During the course of this adversary proceeding, the Receiver may learn (through discovery or otherwise) of additional transfers made to Defendant.   Receiver intends to avoid and recover all transfers made by the Receivership Estates of an interest of Receivership Estates in property and to or for the benefit of the Defendant or any other transferee.  Similarly, the Receiver intends to avoid any Obligations made by the Receivership Estates.   The Receiver reserves the right to amend this original Complaint as to include:  (i) further information regarding the Fraudulent Transfers, (ii) additional transfers, (iii) modifications or revisions to Defendant's name, (iv) additional defendants, or (v) additional causes of action, that may become known to the Receiver at any time during this adversary proceeding, through formal discovery or otherwise, and for the amendments or additional causes of action to relate back to this original Complaint.

## **COUNT I — FRAUDULENT TRANSFER**

**Insider Transfer - Minn. Stat. §§ 513.45(b) and 513.47 or Other Governing Fraudulent Transfer Laws**

54.     The Receiver realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

55.     Defendant is an "Insider" within the meaning of Minn. Stat. § 513.41(7).

56.     The Fraudulent Transfer was made to an insider for an antecedent debt, the Receivership Estates were insolvent at the time, and the insider had reasonable cause to believe the Receivership Estates were insolvent.

57.     As a result of the foregoing, the Receiver is entitled to judgment pursuant to Minn. Stat. §§ 513.45(b)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding any Obligations and avoiding and preserving the Fraudulent Transfer free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfer be set aside, (c) recovering such Fraudulent Transfer or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

## COUNT II – FRAUDULENT TRANSFER

### Actual Fraud - Minn. Stat. §§ 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws

58.     The Receiver realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

59.     The Fraudulent Transfer or Obligations were made or incurred with actual intent to hinder, delay or defraud a creditor to which the Receivership Entity was or became indebted on or after the date of the Fraudulent Transfer.

60.     The Fraudulent Transfer or Obligations were made to or for the benefit of Defendant in furtherance of a fraudulent investment scheme.

61.     As a result of the foregoing, the Receiver is entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding any Obligations and avoiding  and preserving the Fraudulent Transfer free and clear

from any claimed interest of Defendant, (b) directing that the Fraudulent Transfer be set aside, (c) recovering such Fraudulent Transfer in the value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

## COUNT III – FRAUDULENT TRANSFER

### Constructive Fraud - Minn. Stat. §§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws

62.     The Receiver realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

63.     At all times material hereto, Petters was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with Petters after the Fraudulent Transfer and Obligations constituted unreasonably small capital.

64.     Petters received less than a reasonably equivalent value in exchange for the Fraudulent Transfer and Obligations.

65.     As a result of the foregoing, the Receiver is entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding any Obligations and avoiding the Fraudulent Transfer free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfer be set aside, (c) recovering such Fraudulent Transfer or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Defendant.

## <u>COUNT IV – FRAUDULENT TRANSFER</u>

### Constructive Fraud - Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws

66.     The Receiver realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

67.     At all times material hereto and at the time of the Fraudulent Transfer, Petters intended to incur, or believed that he would incur, debts that would be beyond his ability to pay as the debts matured.

68.     Petters received less than a reasonably equivalent value in exchange for the Fraudulent Transfer and Obligations.

69.     As a result of the foregoing, the Receiver is entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding any Obligations and avoiding  and preserving the Fraudulent Transfer free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfer be set aside, (c) recovering such Fraudulent Transfer or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

## <u>COUNT V – FRAUDULENT TRANSFER</u>

### Constructive Fraud - Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws

70.     The Receiver realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

16

71.     At all times material hereto and at the time of the Fraudulent Transfer and Obligations, Petters was insolvent or, in the alternative, Petters became insolvent as a result of the Fraudulent Transfer.

72.     Petters received less than a reasonably equivalent value in exchange for the Fraudulent Transfer and Obligations.

73.     As a result of the foregoing, the Receiver is entitled to judgment pursuant to Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding any Obligations and avoiding and preserving the Fraudulent Transfer free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfer be set aside, (c) recovering such Fraudulent Transfer or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

## COUNT VI – UNJUST ENRICHMENT/EQUITABLE DISGORGEMENT

74.     Receiver realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

75.     At all times relevant hereto, the Fraudulent Transfer received by Defendant was part of the Ponzi scheme and was derived from monies fraudulently obtained by Petters from other investors or participants in the Ponzi scheme.

76.     Defendant, as the recipient of fraudulently obtained proceeds of the Ponzi scheme, has no rightful or legitimate claim to such monies.

77.     Defendant knowingly accepted the benefit.

17

78.     Defendant received the Fraudulent Transfer from Petters knowing that the funds were derived from the Ponzi scheme, and Defendant was unjustly enriched through his receipt of the Fraudulent Transfer to the detriment of the Receivership, and in equity and good conscience must be required to repay the proceeds received.

79.     Defendant would be unjustly enriched to the extent he is allowed to retain the Fraudulent Transfer.

80.     Defendant must, therefore, in equity be required to disgorge all proceeds and assets received through the operation of the Ponzi scheme, so as to allow the Receiver to distribute in equity any such ill-gotten gains among all innocent investors and creditors of the Receivership.

81.     Defendant's acceptance and retention of the benefit is inequitable and violates principles of justice, equity and good conscience.

## PRAYER FOR RELIEF

WHEREFORE, the Receiver respectfully requests this Court enter judgment in favor of Plaintiff and against Defendant as follows:

A.      Count I (Insider Transfer): pursuant to pursuant to Minn. Stat. §§ 513.45(b) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding any Obligations and avoiding and preserving the Fraudulent Transfer free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfer be set aside, (c) recovering such Fraudulent Transfer or the value thereof from Defendant for the

benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

B.    Count II (Fraudulent Transfer – Actual Fraud): pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding any Obligations and avoiding and preserving the Fraudulent Transfer free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfer be set aside, (c) recovering such Fraudulent Transfer or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

C.    Count III (Fraudulent Transfer - Constructive Fraud): pursuant to Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding any Obligations and avoiding and preserving the Fraudulent Transfer free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfer be set aside, (c) recovering such Fraudulent Transfer or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Defendant.

D.    Count IV (Fraudulent Transfer - Constructive Fraud): pursuant to Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding any Obligations and  avoiding and preserving the Fraudulent Transfer free and

clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfer be set aside, (c) recovering such Fraudulent Transfer or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

E.      On Count V (Fraudulent Transfer - Constructive Fraud): pursuant to Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding any Obligations and avoiding and preserving the Fraudulent Transfer free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfer be set aside, (c) recovering such Fraudulent Transfer or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

F.      Count VI (Unjust Enrichment/Equitable Disgorgement): declaring and ordering that the Receiver shall recover the Fraudulent Transfer and any other monies received by Defendant, directly or indirectly, from the fraud perpetrated through the Ponzi scheme, or the value thereof, for the benefit of the Receivership; and that Defendant shall be liable to the Receivership in an amount equal to the Fraudulent Transfer and shall be required to disgorge the same for the equitable distribution to all investors of the Receivership.

G.      On all Claims for Relief, establishment of a constructive trust over the proceeds of the Fraudulent Transfer in favor of the Receiver for the benefit of the Receivership;

H.     Awarding the Receiver all applicable interest (including pre-judgment and post-judgment interest), attorneys' fees, costs and disbursements in this action; and

I.     Granting the Receiver such other, further and different relief as the Court deems just, proper and equitable.


DATED:        June 26, 2012           **KELLEY, WOLTER & SCOTT, P.A.**

By s/Steven E. Wolter
Steven E. Wolter (#170707)
Daniel M. Scott (#98395)
Kevin M. Magnuson (#0306599)
Patricia A. Pedersen (#0240205)
431 S. Seventh Street, Suite 2530
Minneapolis, MN 55414
(612) 371-9090 (telephone)
(612) 371-0574 (facsimile)

ATTORNEYS FOR
DOUGLAS A. KELLEY,
RECEIVER FOR THOMAS J. PETTERS, ET.AL